ATTACHMENT C

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea

Agreement (the "Agreement") between the United States Attorney's Office for the Eastern

District of Virginia, the Tax Division, United States Department of Justice, and the defendant

CREDIT SUISSE SERVICES AG. Certain facts herein are based on information the United

States obtained from third parties through its investigation, and which were described to

CREDIT SUISSE SERVICES AG. CREDIT SUISSE SERVICES AG hereby agrees and

stipulates that the following information is true and accurate. The following facts took place

during the relevant timeframe and establish beyond a reasonable doubt the charge set forth in the

criminal Information attached to this Agreement:

### INTRODUCTORY ALLEGATIONS

1. Credit Suisse AG was a corporation organized under the laws of Switzerland, and

directly and through its parent, subsidiaries and affiliates, operated a global financial services

business in more than 50 countries with over 45,000 employees, including 9,000 U.S.

employees.[1] In the United States, Credit Suisse AG operated as a financial holding company

regulated by the Federal Reserve. Credit Suisse AG, directly and indirectly through branches

and subsidiaries, offered private banking and wealth management services to over two million

---

[1] In May 2024, Credit Suisse AG merged into UBS AG, a Swiss bank that assumed all of
Credit Suisse AG's assets and liabilities and all of its rights and obligations. This merger
was the result of UBS Group AG agreeing in 2023 to acquire Credit Suisse Group AG at the
request of and with the approval of Swiss, U.S., and other financial regulators to avert Credit
Suisse's failure and a potential systemic banking crisis resulting from continued deterioration
of Credit Suisse Group AG.

clients, focusing on ultra-high-net-worth and high-net-worth individual clients around the globe, including U.S. citizens, legal permanent residents, and resident aliens.

2.     CREDIT SUISSE SERVICES AG was a subsidiary of Credit Suisse Group AG and is now a subsidiary of UBS Business Solutions AG, which itself is a subsidiary of UBS Group AG. Created in response to Switzerland's "Too Big to Fail" regulatory regime, CREDIT SUISSE SERVICES AG provided various services (such as risk, operations, legal, and compliance services) to Credit Suisse AG and other group entities.

3.     Unless otherwise specifically noted herein, CREDIT SUISSE SERVICES AG, its former sister entity, Credit Suisse AG, its former parent Credit Suisse Group AG, and its subsidiaries and affiliates prior to the UBS merger, collectively will be called "CREDIT SUISSE" or "the Bank."

## STATUTORY ALLEGATIONS

4.     From January 1, 2010, through at least in or about July 2021, the exact dates being unknown to the United States, in the Eastern District of Virginia and elsewhere, the defendant CREDIT SUISSE did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together with others both known and unknown to the United States to commit the following offense against the United States: to willfully aid, assist in, procure, counsel, and advise the preparation and presentation of false income tax returns and other documents to the Internal Revenue Service ("IRS") of the Department of the Treasury, in violation of Title 26, United States Code, Section 7206(2), all in violation of Title 18, United States Code, Section 371.

## OVERVIEW OF THE OFFENSE CONDUCT

5.      CREDIT SUISSE provided private banking and asset management services to

U.S. taxpayers and assisted certain of those U.S. taxpayers to evade their U.S. tax obligations,

file false federal tax returns with the IRS, and otherwise hide accounts held at CREDIT SUISSE

from the IRS.  CREDIT SUISSE employees assisted such customers in a number of ways,

including by opening and maintaining undeclared accounts for U.S. taxpayers at CREDIT

SUISSE and providing a variety of offshore private banking services that assisted U.S. taxpayers

in the concealment of their assets and income from the IRS and their failure to file FBARs.   In

doing so, CREDIT SUISSE committed new crimes and breached the May 2014 Plea Agreement

("2014 Plea Agreement") with the United States, described more fully in paragraphs 13-18.

### U.S. INCOME TAX & REPORTING OBLIGATIONS

6.      U.S. citizens, resident aliens, and legal permanent residents have an obligation to

report all income earned from foreign bank accounts on their tax returns and to pay the taxes due

on that income.  For the tax year 1976 forward, U.S. citizens, resident aliens, and legal permanent

residents had an obligation to report to the IRS on the Schedule B of a Form 1040, U.S.

Individual Income Tax Return, whether that individual had a financial interest in, or signature

authority over, a financial account in a foreign country in a particular year by checking "Yes" or

"No" in the appropriate box and identifying the country where the account was maintained.

7.      From in or about 1970 forward, U.S. citizens, resident aliens, and legal permanent

residents who had a financial interest in, or signature authority over, one or more financial

accounts in a foreign country with an aggregate value of more than $10,000 at any time during a

particular year were required to file with the Department of the Treasury a Report of Foreign

Bank and Financial Accounts on FinCEN Form 114 (formerly Form TD F 90-22.1) (the "FBAR").

Until 2016, the FBAR for the applicable year was due by June 30 of the following year. The due date then changed to April 15, of the following year to match the federal income tax filing season. As such, for 2016, FBARs (without an extension) were due in April 2017.

8. An "undeclared account" was a financial account owned by an individual subject to U.S. tax and maintained in a foreign country that had not been reported by the individual account owner to the U.S. government on an income tax return or on an FBAR.

9. From in or about the 1930s until the present, Switzerland has maintained laws that ensure the secrecy of client relationships at Swiss banks. Swiss law prohibits the disclosure of identifying information without the client's authorization except through a treaty request via formal intergovernmental channels. Violators of these Swiss criminal laws may be punished by imprisonment. Because of the secrecy guarantee that they created, these Swiss criminal provisions enabled U.S. clients to conceal their Swiss bank accounts from U.S. authorities.

### 2014 CREDIT SUISSE AG GUILTY PLEA

10. Prior to the entry of the guilty plea in May 2014, CREDIT SUISSE repeatedly represented to the Department of Justice, Tax Division and the United States Attorney's Office for the Eastern District of Virginia (collectively, "DOJ") that it had conducted a thorough investigation and, with substantial certainty, had identified all accounts owned and controlled by U.S. persons. For example, on October 23, 2013, CREDIT SUISSE informed DOJ that its consultants' "overall evaluation" was that "[t]he bank has identified its complete population of U.S. accounts to a 95% confidence level with a 1% tolerable error rate." Further, on January 9, 2014, CREDIT SUISSE reiterated its consultant's findings and that "the Bank had succeeded in ferreting out U.S. accounts."

11. On May 19, 2014, CREDIT SUISSE waived indictment and pleaded guilty

pursuant to a plea agreement in the United States District Court for the Eastern District of

Virginia, Case No. 1:14-CR-188-RBS, to one count of conspiracy to aid and assist the

preparation and presentation of false income tax returns and other documents to the IRS, in

violation of 18 U.S.C. § 371.

12.     Under the terms of the 2014 Plea Agreement, CREDIT SUISSE agreed to the

following, among other requirements:

a.     To promptly disclose all evidence and information described in Sections

II.D.1 and II.D.2 of the Program for Non-Prosecution Agreement or Non-Target Letters for Swiss

Banks and in the format requested by the United States.   *See* 2014 Plea Agreement, ¶ 7(B)(1).

These provisions required the provision of information for each U.S. Related Account (as

defined in paragraph I.B.9 of the Program for Non-Prosecution Agreements or Non-Target Letters

for Swiss Banks, without regard to the dollar limit or the applicable time period) that was closed

between August 1, 2008 and the date that a bank received a Non- Prosecution Agreement, as

well as specified transactional data about inflows and outflows in the accounts; and

b.     To close any and all accounts of recalcitrant account holders, as defined in

Section 1471(d)(6) of the Internal Revenue Code; implement procedures to prevent its

employees from assisting recalcitrant account holders to engage in acts of further concealment in

connection with closing any account or transferring any funds; and not open any U.S. Related

Accounts except on conditions that ensured that the account would be declared to the United

States and would be subject to disclosure by CREDIT SUISSE.   *See id.*, ¶ 7(B)(5).

## OVERVIEW OF THE ILLEGAL U.S. CROSS-BORDER BUSINESS TO WHICH CREDIT SUISSE PLEADED GUILTY

13.     In the Statement of Facts accompanying the 2014 Plea Agreement, CREDIT

SUISSE admitted that for decades prior to and through in or about 2009, CREDIT SUISSE

operated an illegal cross-border banking business that knowingly and willfully aided and assisted

thousands of U.S. clients in opening and maintaining undeclared accounts and concealing their

offshore assets and income from the IRS. CREDIT SUISSE admitted that, through certain of its

managers, employees, and others, it solicited U.S. clients to open undeclared accounts because

Swiss bank secrecy would permit it to conceal the U.S. clients' ownership of accounts at CREDIT

SUISSE. CREDIT SUISSE further admitted that it used a variety of means to assist U.S. clients

in concealing their CREDIT SUISSE undeclared accounts, including by:

- assisting clients in using sham entities as nominee beneficial owners of the undeclared accounts;

- soliciting IRS forms that falsely stated under penalties of perjury that the sham entities beneficially owned the assets in the accounts;

- failing to maintain in the United States records related to the accounts;

- destroying account records sent to the United States for client review;

- using CREDIT SUISSE managers and employees as unregistered investment advisors on undeclared accounts;

- facilitating withdrawals of funds from the undeclared accounts by either providing hand-delivered cash in the United States or using CREDIT SUISSE's correspondent bank accounts in the United States; and

- structuring transfers of funds to evade currency transaction reporting requirements; and providing offshore credit and debit cards to repatriate funds in the undeclared accounts.

14.    CREDIT SUISSE further admitted that private bankers (referred to as

Relationship Managers or RMs) served as the primary contact for U.S. clients with undeclared

accounts at CREDIT SUISSE. Managers (including Supervisory RMs) and RMs (collectively

hereafter "managers") in the illegal U.S. cross-border business actively assisted or otherwise

facilitated thousands of U.S. individual taxpayers in establishing and maintaining undeclared

accounts in a manner designed to conceal the U.S. taxpayers' ownership or beneficial interest in said accounts. CREDIT SUISSE maintained correspondent bank accounts in the United States through which CREDIT SUISSE managers and others conducted financial transactions in furtherance of its illegal cross-border business.

15.    CREDIT SUISSE further admitted that, as of 2006, CREDIT SUISSE had approximately 22,000 U.S. client accounts with total aggregate assets under management of approximately $10 billion, which included both declared and undeclared accounts. CREDIT SUISSE maintained undeclared accounts for U.S. clients in different units throughout the bank, but primarily serviced them from various desks located in Zurich and Geneva, Switzerland, including a desk at the Zurich airport.

16.    CREDIT SUISSE admitted that due in part to the assistance of CREDIT SUISSE and its personnel, and with the knowledge that Swiss banking secrecy laws would prevent CREDIT SUISSE from disclosing their identities to the IRS, numerous U.S. clients of CREDIT SUISSE filed false and fraudulent Forms 1040, U.S. Individual Income Tax Returns, which failed to report their respective interests in their undeclared accounts and the related income. Certain U.S. clients also failed to file and otherwise report their undeclared accounts on FBARs.

17.    CREDIT SUISSE further admitted that its policies and compliance training regarding U.S. undeclared accountholders was ineffective in eliminating the illegal cross-border business. In addition, CREDIT SUISSE also conducted ineffectual internal audits to ensure compliance with the directives and policies regarding U.S. clients.

18.    CREDIT SUISSE further admitted that it did not develop and implement an effective system of supervisory and compliance controls over the managers in the U.S. cross-border business to prevent and detect violations of CREDIT SUISSE's policies regarding the

proper handling of accounts for offshore companies beneficially owned by U.S. persons.

CREDIT SUISSE also admitted to failing to effectively monitor and control the activities of

certain managers in the U.S. cross-border business.

## CREDIT SUISSE DID NOT ADEQUATELY IDENTIFY
## U.S. RELATED ACCOUNTS PRIOR TO THE GUILTY PLEA

19.     Prior to the plea, CREDIT SUISSE initially identified U.S. accounts by relying on

computer system flags indicating U.S. nationality or domicile.   This process was proven to be

wholly inadequate to identify U.S. Related accounts.   In its so-called "Project Valentina,"

CREDIT SUISSE subsequently expanded the scope of the review to include searches for U.S.

indicia using other data and free text fields in the Bank's records.   From inception, Project

Valentina was flawed.   First, it did not include a review of Know Your Customer ("KYC") or due

diligence notes, detailed information on the source of a client's wealth, or background and other

information, which were stored in the Bank's computer system.   Second, accounts were

reviewed in isolation, untethered to the context of a larger relationship that included both open

and closed accounts.   Reviewers were deprived of context and other evidence of U.S. indicia that

would have allowed them to make more accurate and comprehensive decisions as to whether

accounts were held by or on behalf of U.S. persons.   As a result, individual reviewers arrived at

contradictory conclusions regarding whether accounts in the same relationship were owned and

controlled by a U.S. person.

20.     Between 2015 and July 2018, with the assistance of a post-plea Monitor, which

was imposed upon CREDIT SUISSE as part of the Consent Order issued by the New York

Department of Financial Services contemporaneous with the 2014 Plea Agreement, CREDIT

SUISSE conducted a "name matching" review, which was designed to search for accounts

booked in Switzerland that did not reflect a U.S. nexus, but belonged to a person previously

identified as a confirmed or potential U.S. person as to a different account. In that period, CREDIT SUISSE reviewed approximately 33,000 accounts and found more than 500 additional U.S. Related accounts.

21.     In 2017, three years after the 2014 Plea Agreement, building on lessons learned from the Name-Matching Program, CREDIT SUISSE began to take a relationship-centric approach in its business-as-usual account review process instead of the narrow account-focused approach.   To that end, CREDIT SUISSE, in approximately 2017, began utilizing a Single Client View ("SCV") software application to help compliance and front-end managers identify clients booked in one location with account exposure in another location and thus help identify all accounts pertaining to a single client relationship.   While the introduction of SCV represented a significant step forward, its full implementation faced delays and revealed shortcomings due to legal privacy restrictions under Swiss law and other jurisdictions, particularly with regard to its integration with the KYC assessment process.  SCV was initially only made available to managers and compliance personnel; RMs did not have access to it until July 2021.   As such, front-line bankers' knowledge was limited to the accounts that they managed.  If their clients had an interest in or control over accounts managed elsewhere in the Bank, the RMs would have been blind to that information.

22.     The Bank has noted that, along with the Name-Matching Program, the Monitor conducted its own independent account reviews and referred certain relationships to the Bank for evaluation.   Furthermore, the Bank conducted other reviews during the Monitorship, including expanding the free text searches for U.S. indicia to KYC materials; analyzing flow-of-funds to identify U.S. accounts; and examining system flags that RMs used to link related accounts.   As a result, additional accounts were identified that should have been identified prior to the 2014

guilty plea based on the investigation that was purportedly conducted for the guilty plea.

23.    In response to the DOJ's disclosure regarding the Horsky relationship, discussed below at paragraph 40, CREDIT SUISSE conducted a review of client relationships and personnel on the Israel Desk that focused on: (1) top clients; (2) relationships previously identified as having a U.S. nexus; (3) relationships involving the use of intermediaries; (4) relationships involving certain personnel (including personnel connected to Horsky or other problematic relationships); and (5) clients who were believed to have self-disclosed to the IRS as U.S. taxpayers through the voluntary disclosure program. While CREDIT SUISSE concluded there were no systematic efforts by Israel Desk employees to violate, or assist customers in violating, U.S. tax or securities laws, it either terminated or disciplined seven employees and identified 13 additional relationships as U.S. relationships.

24.    By early 2020, as DOJ and CREDIT SUISSE continued to identify problematic U.S. accounts that remained open post-plea, there was a growing concern at DOJ regarding the efficacy of CREDIT SUISSE's pre- and post-plea efforts to identify and close U.S. accounts, and CREDIT SUISSE's continued servicing of undeclared accounts.

25.    On February 19, 2020, DOJ directed CREDIT SUISSE to provide a briefing regarding, among other things, the Name-Matching Program and Israel Desk investigation.  As part of that request, DOJ requested detailed data regarding the number of accounts identified as U.S. accounts after the entry of the Bank's guilty plea.   Specifically, DOJ instructed that the presentation should include: the number of accounts, types of accounts and amount of assets under management ("AUM"); the desks the accounts came from; whether the accounts were legacies of Clariden Leu, a problematic CREDIT SUISSE subsidiary; when the accounts were identified and closed; and how the accounts were identified as U.S. (*e.g.*, Name-Matching

Program, Israel Desk review, II.D 2 notification, etc.).

26.     CREDIT SUISSE failed to address the request expeditiously, in part because of the global COVID-19 pandemic. In November 2020, CREDIT SUISSE informed the DOJ that it attempted to produce the data solely using in-house resources, but, by August 2020, realized that it required the assistance of one of its consulting firms, which had been involved in the Name-Matching Program reviews conducted by the Monitor and the 2014 Plea Agreement.   CREDIT SUISSE scheduled the initial presentation on the post-plea data for May 4, 2021, but, on April 30, 2021, informed the DOJ it would not present that data on the grounds that the Bank lacked absolute confidence in its accuracy and consistency.   CREDIT SUISSE never explained why the Bank lacked confidence in its data. Between July 2021 and June 2023, CREDIT SUISSE made eleven lengthy presentations to the DOJ providing detail on its methodology, data analysis, and findings in real time, and incorporating feedback from the Department on the review. Overall, CREDIT SUISSE provided the DOJ with substantial information concerning the conduct described in the Statement of Facts.

27.     Ultimately, however, it took approximately three years for CREDIT SUISSE to fully produce the data that the DOJ requested.   Subsequently, in 2023, CREDIT SUISSE identified additional problematic accounts. Because CREDIT SUISSE has adopted a risk-based approach to its reviews of a large number of historical accounts, CREDIT SUISSE has not reviewed in depth every account that it believes may comprise a U.S. account, or in some instances has done some amount of review but has not been able to assess the level of criminal conduct associated with those accounts. The Offices have concluded that the investigation into U.S. Related Accounts at the Swiss booking center has been comprehensive and thorough. Based on data provided by CREDIT SUISSE, in conjunction with additional information

gathered during the DOJ's investigation, the DOJ identified a population of 439 accounts on which a penalty should be assessed. In addition, the DOJ extrapolated an additional penalty on the identified but unreviewed accounts using various principled analyses, resulting in an additional extrapolated 36 penalty accounts.

## CREDIT SUISSE'S POST-PLEA CONDUCT CONTINUED TO VIOLATE U.S. LAWS

28.     As part of the 2014 Plea Agreement and related resolutions with other government authorities, CREDIT SUISSE undertook efforts following the plea to enhance its U.S. compliance framework and identify remaining U.S. Related accounts. Many of these improvements occurred during the term of the independent monitor appointed by the New York Department of Financial Services (through July 2018). Efforts undertaken included the establishment of a dedicated U.S. compliance organization, enhancement of policies and procedures governing U.S. person accounts, implementation of Foreign Account Tax Compliance Act ("FATCA") policies and procedures, development of U.S. indicia monitoring processes and other controls, creation of technological tools to aid in surveillance and account identification, and conducting additional reviews to identify and close remaining U.S. accounts. As a result of these improvements, CREDIT SUISSE reduced the ability of clients with hidden U.S. status to open new relationships, and closed or terminated a large majority of legacy U.S. accounts by 2018.

29.     However, notwithstanding such efforts, subsequent investigation by CREDIT SUISSE and the Department revealed that CREDIT SUISSE continued to violate U.S. laws, and consequently had breached its 2014 Plea Agreement for this among other reasons, as the 2014 Plea Agreement required that the defendant not commit or attempt to commit any additional federal,

state, or local crimes or else be subject to a declaration of breach and additional prosecution and

penalties.

30.     The post-plea violations of U.S. laws include cases of:

- Bankers falsifying certain bank records to conceal U.S. ownership and control of accounts;
- Bankers ignoring prior evidence of U.S. status for certain accounts and documenting the U.S. owner as non-U.S.;
- Bankers processing fictitious donation paperwork to remove U.S. person(s) from the account and thereafter servicing accounts from which the U.S. person(s) continued to benefit;
- Bankers maintaining 104 accounts connected to a Swiss lawyer/enabler for the benefit of undeclared clients;
- Bankers maintaining an account with a "hidden" U.S. beneficial owner for which there was ample file evidence of the true beneficial owner's control over the account;
- Bankers servicing more than $1 billion worth of U.S. accounts without full documentation of tax compliance long after accounts should have been closed; and
- Bankers transferring paper ownership of an account known to be U.S. to a Swiss trust company as part of a sale that facially appears to be a sham.

31.     In each instance described above, the U.S. accounts in question were high-value

accounts.   In addition, prior to the 2014 guilty plea, CREDIT SUISSE did not fully identify the

U.S. accounts that should have been identified, some of which remained open, undeclared, and

serviced after May 2014.  As part of its cooperation after the plea, CREDIT SUISSE identified

and disclosed additional U.S. accounts and provided the Department information regarding

violations of U.S. law.

32.     Ultimately, the Department determined that there were at least 475 accounts that

CREDIT SUISSE knew or should have known were U.S. accounts, many of which pre-existed

the guilty plea but were not identified as U.S. accounts at the time of the 2014 guilty plea, with a

total AUM from August 2008 forward of $4,044,437,273.  The majority of these legacy U.S.

accounts were closed or terminated by 2018.  The tax loss associated with those accounts is

$71,266,527 from August 2008 forward with associated revenues from August 2008 forward of $108,630,945.

**WAYS IN WHICH CREDIT SUISSE BREACHED THE 2014 PLEA AGREEMENT**

33.     As part of the 2014 Plea Agreement, CREDIT SUISSE undertook the following three affirmative obligations, among others: to close recalcitrant U.S. accounts; to implement procedures to prevent employees from aiding and assisting recalcitrant accountholders to engage in further concealment; and to not open any "U.S. Related Accounts" (as defined under the Swiss Bank Program) except under circumstances where the accounts would be declared to the United States. Furthermore, the Bank agreed to provide detailed, albeit anonymized, reporting on U.S. related accounts. The 2014 Plea Agreement specified no temporal limitation on these commitments.

34.     CREDIT SUISSE violated the 2014 Plea Agreement when it failed to close recalcitrant accounts that it knew to be U.S. in a timely fashion. 2014 Plea Agreement, ¶ 7(B)(5) ("CREDIT SUISSE AG will close any and all accounts of recalcitrant account holders. . . .). Based on data provided by CREDIT SUISSE, 44 accounts (with post-plea maximum AUM of $196 million and 2008 maximum of $269.3 million) that were open pre-plea, with pre-plea knowledge of the U.S. indicia and self-described "low vigilance post-plea," were closed in 2016 or later (allowing for approximately 18 months to close accounts post-plea). Nineteen (19) of those, with post-plea AUM of $101 million were closed after the monitorship.

35.     CREDIT SUISSE violated the terms of the 2014 Plea Agreement by opening accounts for U.S. persons it knew or should have known were U.S. after the plea under circumstances where the accounts were not declared to the United States. 2014 Plea Agreement, ¶ 7(B)(5). Looking just at penalty population accounts, twenty-six (26) accounts that were

reviewed by counsel, comprising $122.9 million post-plea AUM, fall into this category, of which 16 closed post-monitorship. Thirty (30) additional accounts with post-plea AUM of $51.8 million were identified as potential U.S. accounts but were unreviewed by counsel and therefore there are likely more accounts that fall into this category. As a result, CREDIT SUISSE failed to provide timely disclosure of certain accounts opened after the plea to the United States. This assisted the U.S. persons in the concealment of their assets.

36.    Paragraph 7(B)(1) of the 2014 Plea Agreement required CREDIT SUISSE to provide detailed, albeit anonymized, information on every U.S. Related Account (as defined under the Swiss Bank Program), which included so-called II.D.2 transactional data. CREDIT SUISSE violated its duty to provide reporting regarding closed accounts in two manners. First, immediately after the plea and for years thereafter, it failed to provide the requisite information about certain accounts that closed prior to the plea that CREDIT SUISSE knew were U.S. accounts. This equals 49 known accounts, with a post-August 2008 AUM of $462,518,775. Second, CREDIT SUISSE failed to provide in a timely and complete manner the requisite information about certain accounts that closed after the plea that it knew or should have known were U.S. accounts. Eighty accounts with post-plea AUM of $926.6 million fall into this category.

37.    There are numerous examples of accounts that CREDIT SUISSE knew to be U.S. accounts that closed prior to the plea but that were not reported to the government and should have been. The most obvious examples concern the accounts controlled by Dan Horsky and the U.S.- Colombian Family, discussed below at ¶¶ 39 and 48, respectively. Horsky held two accounts in his own name that were closed prior to the plea, one where he was documented as a U.S. person and another where he was documented as a foreign national. Nonetheless, even

though the same employee on the Israel Desk managed all the accounts in the Horsky

relationship, CREDIT SUISSE initially reported only those two Horsky accounts in its II.D.2

reporting.   However, it did not designate all the accounts in the relationship, which had assets in

excess of $200 million, as U.S. until the government brought them to the CREDIT SUISSE's

attention.

      38.     Between 2005 and 2013, CREDIT SUISSE maintained nine different accounts for

the U.S.-Colombian Family with $93 million in cumulative AUM.   At the time that the accounts

were closed before the 2014 Plea, the Bank knew that the U.S.-Colombian Family members were

U.S. persons, yet documented only two of the accounts as U.S. accounts. CREDIT SUISSE did not

include either of the accounts it documented as U.S. in its II.D.2 reporting because those accounts

never had sufficient AUM to trigger the reporting requirement.   As a result, CREDIT SUISSE

never informed the banks that received the Family's assets that the Family members were U.S.

persons, and the Family was able to continue concealing assets from the U.S. through use of

offshore accounts until June 2021.

### SPECIFIC EXAMPLES OF CREDIT SUISSE'S MISCONDUCT

      39.    **The Horsky Relationship: Use of a Non-U.S. Nominee to Conceal Ownership**

      a.     The Horsky relationship, which opened in 2000 and closed in 2016,

involved multiple employees committing misconduct in order to permit Dan Horsky to maintain

control of the accounts and retain the assets at CREDIT SUISSE.   In account records, Relative-1,

a foreign relative of Horsky, was documented as the beneficial owner of the assets in the

accounts, even though bank employees neither met nor communicated with this individual;

rather they only communicated with Horsky and Relative-2, who acted at Horsky's direction,

and outflows from the accounts were made for Horsky's benefit.   In 2015, DOJ obtained proof

that Dan Horsky, a U.S. citizen and resident, owned and controlled accounts at CREDIT SUISSE with assets under management in excess of $200 million.    Shortly thereafter, Horsky agreed to plead guilty to conspiring to defraud the United States and to filing a false IRS Form 8854, Initial and Annual Expatriation Statement.

        b.     CREDIT SUISSE Market Leader-1, a high-level supervisor over the accounts, met with Horsky three times and never documented the meetings in bank records. Indeed, he deliberately concealed the first two meetings from the RM and her manager.    When Relative-2 sent emails to the RM that revealed that CREDIT SUISSE Market Leader-1 was meeting Horsky and that Horsky, in essence, was in control of the account, they researched the history of the account and discovered that Horsky had been the beneficial owner from 2000 through 2007.    The RM, her manager, and her assistant attempted to cover themselves by having the manager email the Legal and Compliance department and inquire whether Horsky's past association with the Horsky Holdings account was problematic.    The email was materially misleading as it stated that Horsky had "no involvement/signatory rights on the account."    In particular, the email failed to disclose CREDIT SUISSE Market Leader-1's meetings with Horsky and his long-time control over the account. At the time, CREDIT SUISSE Legal and Compliance did not have a tracking system for such requests regarding the involvement of U.S. persons, nor did it conduct an independent inquiry of the matter beyond the information provided by the front-line employees. Rather, it blessed the arrangement after receiving responses to a series of superficial questions it had posed regarding the nominal beneficial owner.

        c.     CREDIT SUISSE Market Leader-1's illicit dealings culminated in a January 2016 meeting with Horsky in Tel Aviv.    In that meeting, CREDIT SUISSE Market Leader-1 acknowledged that Horsky was the owner of the assets and strategized on means by

which Horsky could defraud the U.S. by perpetrating a ruse that Relative-1, the nominal owner

of the accounts in the relationship, could "gift" him the assets in the accounts.    Further, at that

meeting, CREDIT SUISSE Market Leader-1 accepted at least one instruction from Horsky to

transfer funds out of the Horsky Holdings account (via another Horsky-controlled entity account

at CREDIT SUISSE) to an account in Horsky's name in Israel.    Horsky explicitly stated to a

CREDIT SUISSE RM that he intended to use the funds to purchase an apartment in New York

City.  At the time CREDIT SUISSE Market Leader-1 met with Horsky in Israel in January 2016,

the Horsky account relationship reached a high value of CHF 240 million, making it one of the

top 10 accounts on the Israel Desk.  CREDIT SUISSE earned approximately CHF 4.9 million in

gross income in fees from the accounts in the relationship between 2003 and 2016.

        d.     The above-described post-plea misconduct was a continuation of

misconduct that occurred prior to the plea, which included, among other things: allowing Horsky

to change the beneficial ownership of the account with little justification; allowing Horsky to

control the accounts and assets when he had no authority to do so; maintaining declared and

undeclared accounts; directing Horsky not to communicate through his U.S.-based email account

but to utilize a Swiss-based email account; an executive in the market area and employee

encouraging Relative-2, who was a U.S. person and succeeded Horsky as having signature

authority over the accounts in the relationship, to expatriate and then receive the assets of the

Horsky Holdings account as a gift; and CREDIT SUISSE Market Leader-1 pressuring an

employee not to close an account in the relationship when the employee suspected that a U.S.

person owned and controlled the account.

        e.     In November 2016, Dan Horsky pleaded guilty in the Eastern District of

Virginia to conspiring with others to defraud the United States and to submit a false expatriation

statement to the IRS, and agreed to pay an FBAR penalty of $100 million.

40. **The "Hong Kong Mother" Case: KYC Documents Falsified to Hide U.S. Owner**

a.     In this relationship, worth over $27 million, a CREDIT SUISSE banker—post-plea—falsified the Bank's KYC records to hide a U.S. beneficial owner. CREDIT SUISSE subjected the accounts to successive reviews, but each time accepted the fabricated KYC; and even though the accounts bore all the hallmarks of tax evasion, the Bank closed the accounts without any timely notice to the U.S.

b.     In 2015, a CREDIT SUISSE banker changed KYC documentation in an account held in the name of an entity to conceal that a U.S. person was the source of funds and likely beneficial owner of the assets in the account, despite abundant evidence in the account file, and others linked to it, that showed the U.S. person was the owner.

c.     CREDIT SUISSE had substantial evidence in its possession that showed that the U.S. person was the true beneficial owner of the assets.  For example, had CREDIT SUISSE conducted a flow-of-funds analysis in any of the three reviews, it would have realized that the entity account had been funded by two closed accounts.  The KYC files in both of those accounts documented the same U.S. person as the source of funds.  Indeed, had they consulted the files of Project Valentina, which had reviewed one of the funding accounts the year prior, they would have found that CREDIT SUISSE ordered that funding account closed because of U.S. indicia.

d.     CREDIT SUISSE subjected the entity account to successive reviews, including one review that focused on the KYC change, but CREDIT SUISSE failed to detect the fraud even though it had ample evidence to prove it.   First: beginning no later than 2009, the

KYC file of the entity account noted that it had been funded from the medical practice of a U.S. person (who also was identified as a secondary beneficiary and protector of the underlying trust that owned the entity).   This U.S. person who had funded all the accounts in the relationship had a separate account at Clariden Leu, then owned by CREDIT SUISSE, that documented him both as the beneficial owner and as a U.S. person.   Clariden Leu closed the account in 2011 after the U.S. person failed to provide documentation that the person was tax compliant.   In 2015, during a review conducted by Credit Suisse Trust, a subsidiary of CREDIT SUISSE, to examine the U.S. indicia associated with the entity account, the Banker changed the KYC data to show purported funding from a non-U.S. person.  Credit Suisse Trust accepted the Banker's representation at face value without either any explanation of the change or any investigation of its own to verify the claim.

      e.      Months later, CREDIT SUISSE's Financial Crimes unit identified the KYC change and sought an explanation.   The desk that managed the entity account responded that the Banker had been told, in contrast to the account documentation, that a non-U.S. person was the beneficial owner and that the U.S. person who had been identified as the source of funds could not be the beneficial owner as he had not visited the bank in four years.   Like Credit Suisse Trust, the Financial Crimes unit accepted the explanation and never sought to verify it.

      f.      In 2016, CREDIT SUISSE's U.S. Legal & Compliance reviewed the entity account because the U.S. person who funded it, as well as the person's family members, were beneficiaries of the underlying trust.   U.S. Legal & Compliance failed to spot the fraud and, instead, allowed the account to remain open on the condition that the RM, who unbeknownst to them had committed the fraud, would "perform heightened due diligence."

      g.      In December 2017, the nominal beneficial owner died, and CREDIT

SUISSE sent the entity account to the closure desk because the U.S. person who funded the account, as well as his family members, were the beneficiaries of the underlying trust. The account sat there for over two years as no closing instructions had been received by CREDIT SUISSE. In 2020, one of the U.S. beneficiaries appeared, provided a letter from a U.S. law firm, and transferred the assets back to the United States. CREDIT SUISSE did not give timely notice to either DOJ or the IRS of the transfer of the account or the relationship's problematic history. Such notification, via timely provided II.D.2 reporting for the accounts in the relationship to the DOJ, was required under the terms of the 2014 Plea Agreement.

41. **Individual-1 Case: A Fictitious Donation Relationship**

a. The Individual-1 case is an example of bankers falsifying documentation in the files by accepting a new Form A, a Swiss banking form that declares the ultimate beneficial owner of an account, which falsely showed a non-U.S. nominee as the new beneficial owner of the assets, while knowing that the true owner was a U.S. person. The bankers intentionally failed to document indicia that a U.S. person was involved in the account. Moreover, CREDIT SUISSE's pre- and post-plea efforts to identify the U.S. accounts were ineffective; and supervisory CREDIT SUISSE employees professed themselves to be too busy to exert minimal efforts to know their clients and, in so doing, prevent tax evasion.

b. From 2011 through 2017, Individual-1 used a nominal beneficial owner, Nominee-1, to conceal the individual's ownership and control of an entity account. The entire relationship, which was comprised of four different accounts during that time frame, was worth approximately $18 million. Despite subjecting the account to a review under Project Valentina, CREDIT SUISSE inexplicably concluded that Individual-1 was neither the beneficial owner nor a U.S. person, despite concluding the opposite on a predecessor account.

   c. The Relationship Manager ("RM-1") and Individual-1 had undocumented meetings and conversations, some of which RM-1 conducted from RM-1's personal phone line.  The Desk Head ("DH-1"), who nominally supervised the RM-1 and Individual-1's accounts, admitted that DH-1 had no time for actual supervision, and did not supervise the account, as DH-1 was consumed with other duties.

   d. In 2015, one of Individual-1's accounts was identified in the Name-Matching Program instituted by the DFS Monitor.  However, because the account was reviewed (and terminated) as part of CREDIT SUISSE's FATCA compliance process, the account was not reviewed through the Name Matching Program, and therefore no relationship-based review was conducted.  Between 2015 and 2016, CREDIT SUISSE bankers repeatedly communicated with Individual-1 that CREDIT SUISSE required FATCA documentation and proof of tax compliance from the country of which Individual-1 had represented they were a citizen.  Neither Individual-1 nor the nominal beneficial owner provided the documentation or executed the documents.

   e. In May 2016, DH-1 assumed direct responsibility for the Individual-1 account but never reviewed any part of the account file, despite the account being in the top 20 accounts (in terms of assets under management) on the desk.  Ultimately, in 2017, the account was transferred to the Client Taskforce Closure desk for closing as FATCA documentation had not been produced.  That should have ended the participation of bankers from the same desk.  CREDIT SUISSE policies required closure of the account and transfer to an account outside of CREDIT SUISSE held in the name of the same entity.  An assistant RM who reported to DH-1 circumvented the policy by obtaining approval from the bank's FATCA specialists to close the account themselves and transfer the assets to an account held in the name of a different entity

account at another Swiss bank, allowing the tax evasion scheme to continue. Consistent with the behavior of other bankers, DH-1 and the assistant RM failed to document much of the closure activity in the account file. CREDIT SUISSE failed to timely provide II.D.2 reporting for the accounts in the relationship to the DOJ.

42.    **The Venezuelan Couple Case: A Second Fictitious Donation Case**

a.    This is a classic case of a fictitious donation to avoid FATCA compliance, disclosure of tax noncompliance, and closure of the account.   In June 2015, after the May 2014 guilty plea, CREDIT SUISSE sought FATCA documentation from a married Venezuelan couple ("Couple-1"), who owned and controlled an account with AUM of $12 million that had been open since 2006. Couple-1 had recently transferred $200,000 to the United States and advised the Relationship Manager ("RM-2") in an email that they were using the funds to purchase a house in the United States. Couple-1 did not provide the FATCA forms; instead, in 2016 they informed RM-2 that they "gifted" the account to their son, a Venezuelan; and that their nephew would hold power of attorney.   It appears that Couple-1 also informed RM-2 via email that they intended to move to the United States. Despite the U.S. indicia in the emails, the RM did not escalate this information to supervisors or to Legal and Compliance.

b.    The change in beneficial ownership triggered a review by U.S. Legal & Compliance in December 2016, but that unit accepted the story about the change of ownership and did not perform a flow-of-funds analysis, which would have shown that the change in ownership was a sham.   That is, in the fall of 2016, there was an inflow of CHF 4.4 million from an account associated with Couple-1's firm at another Swiss bank and an outflow of $3 million to an account in the United States held in the name of an entity bearing the initials of Couple-1.

In the three subsequent years, $500,000 was transferred out to an account bearing the initials of Couple-1 at a bank in Puerto Rico.

        c.     From 2019 forward, the RM reported to Compliance that there was evidence of U.S. indicia associated with transfers to an account in the United States held in the name of the nephew.   Each time, the Bank conduced a cursory review that closed after the nephew provided evidence that he resided in Venezuela and had not traveled to the United States.   But these reviews ignored the larger evidence of U.S. indicia, in particular the flow of funds.   The Bank terminated the account in 2021 after it elected to withdraw from a segment of the Venezuelan market, but could not close the account due to non-transferrable securities.   The rest of the assets were transferred to an account held by the son in Puerto Rico.   CREDIT SUISSE did not provide II.D.2 reporting to the DOJ for the account in the relationship.

        43.     **The Brothers Relationship: A Third Fictitious Donation Case**

        a.     In another case of a fictitious donation, pre-plea misconduct by a CREDIT SUISSE manager and employees allowed accounts with assets exceeding $100 million that were owned, at least in part, by a U.S. person to remain open past the plea.   The earliest of the accounts was opened in 1983.   This relationship involved two brothers with nearly identical names, one of whom was a U.S. person ("U.S. Brother") and the other Swiss ("Swiss Brother"). CREDIT SUISSE bankers removed U.S. Brother as a documented owner in 2008, after Swiss Brother sent his banker a flurry of emails attaching news articles discussing U.S. enforcement efforts against offshore banking.   In an email shortly thereafter, the banker noted that the brothers were joint owners of assets (which were valued at over $114 million) and that U.S. Brother was uncomfortable losing formal control over them.

        b.     Both before and after the May 2014 guilty plea, CREDIT SUISSE

reviewed the files of the accounts in the relationship numerous times, including during Project

Valentina, the DFS Monitor, and other inquiries, most of which focused on the U.S. indicia

related to the Swiss Brother.   The account files did not contain evidence that the U.S. Brother

either had a financial interest in the assets or exerted control over the accounts after bankers

removed his name from the Form A, which declared the beneficial owner, in 2008.

        c.      After the change of beneficial ownership, for which, in a 2012 email to a

front office manager, a banker admitted he could not find any justification, there was evidence

that U.S. Brother continued to control the assets by meeting with bankers, communicating with

bank personnel through Swiss Brother, and receiving vast outflows from the account, often

labeled as "loans."   Further, in 2010, management removed a RM who raised questions about

the structure of the accounts, and subsequently, at times, directly managed the accounts in the

relationship, which was outside the norm.

        d.      Emails and other materials involving the managers and bankers, not kept

in account files, showed that CS employees understood that a U.S. person was a true beneficial

owner of the assets and that a CREDIT SUISSE manager prevented others from realizing the

same.   The bankers had an incentive to hide U.S. Brother's ownership as, post-plea, the

relationship was a large relationship and generated substantial income for CREDIT SUISSE.

The relationship was terminated in 2017, after DOJ disclosed the U.S. status of the Horsky

relationship and CREDIT SUISSE engaged in a review of the relationship.   During the review,

CREDIT SUISSE concluded that the relationship was U.S. related, and disclosed the

relationship to the DOJ.   In violation of the 2014 Plea Agreement, CREDIT SUISSE failed

to timely provide II.D.2 reporting to the DOJ for the accounts in the relationship.

44.     **The Swiss Lawyer Pass-Through Case**

a.      During the DOJ Post-Plea Review, in approximately 2022, CREDIT SUISSE first identified a Swiss lawyer ("Swiss Lawyer-1") whom it realized was connected to many undeclared accounts held by U.S. persons – namely, approximately 13 relationships encompassing 104 accounts.  As soon as CREDIT SUISSE discovered this situation concerning Swiss Lawyer-1, it disclosed the matter in line with applicable laws to the DOJ.  While ultimately Swiss Lawyer-1 deceived the bank, CREDIT SUISSE should have found the relationship and his role, the related accounts, and transfers between Swiss Lawyer-1's accounts and those held by U.S. persons earlier than it did.

b.      CREDIT SUISSE first began an investigation of Swiss Lawyer-1 in early 2022, when Compliance noticed unusual outflows from an account relationship later classified as U.S. to Swiss Lawyer-1's own account.  CREDIT SUISSE initially suspected that Swiss Lawyer-1, who held power of attorney over the accounts, transferred funds through his own account and passed them on to the U.S. persons who beneficially owned the CREDIT SUISSE accounts.  Swiss Lawyer-1 labeled the transfers as attorney's fees to deceive the bank and break any link between the beneficial owners and their undeclared accounts.  But CREDIT SUISSE ultimately concluded that Swiss Lawyer-1 falsely characterized the transfers, not to conceal transfers to the ultimate beneficial owners, but to hide his embezzlement of the funds.  CREDIT SUISSE suspected that Swiss Lawyer-1 stole the money since the beneficial owners were reluctant to take control over their accounts for fear of disclosing their past tax evasion.

c.      CREDIT SUISSE concluded that 91 of the 104 U.S. accounts had closed prior to the plea, and the remaining 13 were not closed, but had been sent to the closing desk.  The bank's email review showed that, prior to Clariden Leu's merger into CREDIT

SUISSE in April 2012, Swiss Lawyer-1 had worked with a Clariden Leu RM to assist U.S. persons to conceal their accounts by, among other things, using his law firm's account as a pass-through. The RM left Clariden Leu prior to the merger and took several U.S. person relationships with significant assets to another Swiss bank. Swiss Lawyer-1 used his account at CREDIT SUISSE to engage in transactions with some of the accounts that he moved to the other Swiss bank. CREDIT SUISSE did not provide an explanation as to how it had failed to detect the attorney's role in so many accounts prior to 2022. As such, in violation of the 2014 Plea Agreement, CREDIT SUISSE failed to timely provide II.D.2 reporting for the U.S. accounts connected to Swiss Lawyer-1 to the DOJ.

45. **The Italian Family Accounts: CREDIT SUISSE Bankers Conceal a U.S. Owner**

a.      In this relationship involving three accounts either owned or settled by an elderly Italian woman, the account file contained evidence that bankers knew that a U.S. person, the woman's son, was a hidden beneficial owner. The earliest of these accounts opened in March 2006 and remained open post-plea, with a post-plea maximum AUM of over $26 million, CREDIT SUISSE opened two of the accounts – a trust account and an individual account in the mother's name – in 2006 and a third account in 2011 in the name of an entity. Credit Suisse documented only one account, the trust account, as a U.S. Related account. CREDIT SUISSE provided II.D.2 reporting for the trust account, but failed to provide it for the other two.

b.      CREDIT SUISSE maintained and serviced these accounts post-plea despite evidence that the son, who lacked any formal authority over the accounts, both was the owner of the assets in the accounts and a U.S. person. That evidence included: a 2006 credit

card application that identified him as a U.S. person; the son's use of that card in the United States; that the son, and not the mother, met with bankers; that in the bankers' notes system, the bankers referred to the client using male pronouns; that the son received substantial distributions from one account purportedly owned by a charitable trust, and the son informed the bank that he intended to use those funds to purchase land and construct a villa on St. Barts – even though he was not a beneficiary of the underlying trust, charities were; and that in 2014, CREDIT SUISSE received a II.D.2 notice informing them that one account in the relationship received one or more transfers of securities from an account at another Swiss bank, which the other Swiss bank had identified as belonging to a U.S. person.

      c.    In 2017, CREDIT SUISSE bankers contacted the bank's U.S. Cross-Border Legal team when they received a new Form T—a Swiss banking form used to identify settlors, beneficiaries, and other details relating to trusts—for the trust account that, for the first time, documented the son as the beneficiary of the trust and identified him a U.S. person.   U.S. Cross-Border Legal indicated that approval could be granted for the arrangement, which was an exception to the general prohibition at the time on maintaining trust accounts with U.S. beneficiaries, if certain conditions were satisfied.  The Form T was subsequently accepted, in October 2017.   Had U.S. Cross-Border Legal either examined the account files or conducted a flow-of-funds analysis, they would have recognized the son's prior control and benefit from the accounts.   Such a conclusion should have led CREDIT SUISSE to identify all the accounts in the relationship as U.S. and close the accounts in a timelier manner.  Instead, the last account in the relationship was sent to the Compliance Resolution desk in 2018 when the banker did not obtain an exception to the policy prohibiting accounts with U.S. beneficiaries.

46.    **The European Billionaire Relationship: CREDIT SUISSE Ignores Evidence that European Billionaire is U.S. Person**

a.    CREDIT SUISSE held multiple accounts valued, prior to the 2014 Plea Agreement, at more than $1 billion, for the scion of a wealthy European family.   In 2015, CREDIT SUISSE received an email and instruction to pay the European Billionaire's 2014 U.S. individual income taxes.   Despite receiving the 2015 instruction, CREDIT SUISSE did not classify the European Billionaire as a U.S. person at that time, seek information about his status for prior years, or close the account.   Instead, the account continued to remain open, even after the European Billionaire emailed the RM a tabulation of the days he spent in the U.S. in response to a question regarding U.S. indicia, indicating that he was substantially present in the United States.   But even then, CREDIT SUISSE allowed the account to remain open, and extended the permission for three years in a row, because among other reasons the account holder claimed he intended to leave the U.S. and this account was FATCA compliant.

b.    CREDIT SUISSE has noted to DOJ that the account files contained "inconclusive" evidence of U.S. indicia prior to 2015, including: news reporting regarding the account holders' involvement in a U.S. industry; his association with U.S. addresses beginning in 2010; a standing order instruction to pay his housekeeper in the U.S.; and ownership of real property in the U.S. by a trust he controlled.   However, given the size of the relationship, and its connection to an even larger relationship, CREDIT SUISSE had the highest obligation to know as much about its client as possible.   A cursory review of publicly available information shows that, no later than 2012 and as early as 2010, the European Billionaire was the subject of numerous news articles that identified him as a U.S. resident living in a mansion and referenced lawsuits in which he admitted to U.S. residency.   CREDIT SUISSE kept the account open for

years after it had definitive knowledge of the account holder's U.S. status, and could have easily ascertained his U.S. status much earlier.

47.  **The Israeli-American Businessman: CREDIT SUISSE Processes Change of Ownership Documentation in a Sale Clearly Without Economic Substance**

a.  The account holder ("the Businessman") is a businessman holding both United States and Israeli citizenship.  In 2019, he opened accounts at CREDIT SUISSE in his own name, for which he was identified as a U.S. person, and in the name of an offshore company, "Company-1", which was controlled by a trust, "Trust-1." In its files, CREDIT SUISSE identified the Businessman as Trust-1's settlor and a foreign charity as the beneficiary. Trust-1's main asset was a 30% interest in a large private real estate group in Israel ("the Real Estate Group"), that the Businessman had "donated" to Trust-1 years before.  The Trust-1 purportedly was controlled by a fiduciary, but CREDIT SUISSE acknowledged in its KYC materials that the Businessman was the owner of Trust-1 and held control.

b.  The opening of the Company-1 account was part of a larger scheme created by the Businessman and others to transfer control of the 30% interest in the Real Estate Group from the Trust-1 back into the Businessman's name.  To that end, the Businessman caused Company-1, and its interest in the Real Estate Group, to be "sold" to an entity controlled by a third party, a Swiss-based professional trust company operator with Irish citizenship.  In so doing, CREDIT SUISSE accepted a new Form A for the Company-1 account that identified the third party as the beneficial owner of the assets in the account.  As has been admitted by the Businessman and others, the sale had no economic substance as the third party immediately sold the interest in the Real Estate Group to an entity controlled by the Businessman.  And on its face, the sale did not make economic sense.  First, the third-party buyer did not appear to have

the means to purchase the ownership interest in the Real Estate Group given that the Bank estimated his net worth at $5 million (compared to its estimate of $260 million for the Businessman). Second, no cash changed hands. Instead, the third-party buyer's entity provided Trust-1 with a promissory note for the entire purchase price and agreed to pay $130 million from the future profits of Company-1.

      c.     CREDIT SUISSE accounts were involved in every step of the process, with the three accounts at issue having a relationship high watermark AUM of $27.1 million. CREDIT SUISSE reviewed documents related to the "sale" of Company-1 and raised neither questions nor concerns, even though the briefest review of the documents showed that the transactions made no economic sense. Further, CREDIT SUISSE accepted a Form A with a new beneficial owner for the Company-1 account without subjecting the change to exacting scrutiny at the time they were initially received.

48.     **The U.S.-Colombian Family: Undeclared and Undisclosed Dual Citizens Serviced by CREDIT SUISSE Until 2013**

      a.     Mother, Son, and Daughter (collectively, the "U.S.-Colombian Family") were dual U.S.-Colombian citizens, and United States taxpayers or former U.S. taxpayers. Son expatriated in 2017. Their father was a dual U.S.-Colombian citizen who died in the mid-2000s.

      b.     Over time, the U.S.-Colombian Family held at least 15 accounts with CREDIT SUISSE in Switzerland between no later than 1979 and January 2013 with assets under management of approximately $93 million. (One small account, opened in 2002, was sent to the Termination Desk in October 2013, but re-opened in January 2018 due to an illiquid asset.) Between 1995 and 2002, the U.S.-Colombian Family opened seven different numbered accounts at CREDIT SUISSE in Switzerland. Several early account files contained documents

reflecting the family's U.S. status, and Credit Suisse Trust authored a memo in 2000 about the U.S.-Colombian Family being U.S. persons who sought to conceal their assets from U.S. authorities.   Mother was identified as beneficial owner of the assets on all seven accounts. Father, Son, and Daughter were each identified (along with Mother) as beneficial owners of assets in two of the accounts.   In 2005, the bulk of the assets were transferred to six accounts held in the names of entities that Credit Suisse Trust formed and managed.   However, at that time, CREDIT SUISSE documented the U.S.-Colombian Family only as Colombian citizens residing in Colombia, despite the earlier documentation of their U.S. status.

        c.      In or around July and August 2012, CREDIT SUISSE obtained documents and information from Credit Suisse Trust showing that the U.S.-Colombian Family members were U.S. citizens, including a copy of the 2000 memo.   Even though each member of the U.S.-Colombian Family signed false statements declaring that they were not U.S. citizens, in or about November 2012, CREDIT SUISSE terminated the accounts and designated them for closure.

        d.      At the same time, Mother and Son began exploring the possibility of continuing the concealment of their assets by, among other means, purchasing Private Placement Life insurance (PPLI or "insurance wrapper") from a Swiss Life PPLI carrier.   In November, 2012, Son sent an email to the CREDIT SUISSE RM assigned to terminate the U.S.-Colombian Family's accounts, in which he stated that family members met with representatives from Swiss Life and "they are ready to open the life insurance policy that we have requested for my Mother, but they require a recommendation letter from CREDIT SUISSE to complete their documentation."   The next day, Credit Suisse Trust sent a letter of reference to a Swiss Life representative stating that Mother had been a client of Credit Suisse Trust for 7.5 years.   Son

and Daughter obtained similar reference letters from another Swiss Bank, where they also had accounts.

    e.  Instead of opening a PPLI policy, the U.S.-Colombian Family transferred the assets in the CREDIT SUISSE accounts to accounts at a bank in Andorra; Bank Leumi Le Israel B.M. in Israel; and PKB Privatbank SA and UBP in Switzerland.   Thereafter, in or about 2017 and 2018, $80 million worth of assets at the Israel Bank and one of the Swiss Banks were transferred to an account at a third bank in Switzerland held in the name of the now-expatriated Son.   The consolidation of the assets was part of a scheme devised by the family members and their advisors to "donate" assets to Son after he renounced his U.S. citizenship, thereby evading U.S. taxation.

    f.  CREDIT SUISSE closed all of the accounts pre-2014 guilty plea but failed to provide information about the accounts either pre-2014 guilty plea or post-plea, or II.D.2 reporting on the accounts, until after DOJ brought the accounts to counsel's attention years after the 2014 Plea Agreement.

### CREDIT SUISSE Opened and Serviced Insurance Wrapper Accounts

   49.  Unlike ordinary life insurance, PPLI products contain an investment component, which is typically managed by an external asset manager, and an insurance component, such as life insurance or an annuity benefit.   The investment component of a PPLI policy, comprising the "premiums" or contributions to the policy, is held through an individual policy investment account custodied at a non-U.S. bank, here CREDIT SUISSE.   The individual policy investment account was held in the name of the insurance carriers, rather than the ultimate beneficial owner of the policy.   These products are sometimes referred to as "insurance wrappers" because the insurance component is "wrapped" around the investment component, i.e., the policy investment

account.    These products can provide legitimate tax-deferral benefits but only when properly structured, funded with declared assets, and reported to the IRS to the extent required by relevant U.S. tax regulations, which in some instances they were not.

50.    CREDIT SUISSE opened and maintained 66 accounts connected to relationships involving insurance wrapper accounts that CREDIT SUISSE knew or should have known were U.S. accounts, with a maximum AUM of at least $180 million, although 17 of the accounts in these insurance wrapper relationships (with maximum AUM of at least $50 million) have some indicia of tax compliance.    Some of the wrapper policies were issued by a CREDIT SUISSE subsidiary and others were issued by external insurance companies.

*****

51.    CREDIT SUISSE SERVICES AG admits, accepts, and acknowledges that it is responsible under U.S. law for the acts of CREDIT SUISSE's officers, directors, employees, and agents as set forth above.    The acts of employees and agents of CREDIT SUISSE described herein were performed within the scope of their employment and agency and were intended, at least in part, to benefit CREDIT SUISSE.    The acts taken by CREDIT SUISSE, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law.    The parties acknowledge that the foregoing statement of facts does not describe all of the defendant's conduct underlying the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney
Eastern District of Virginia
U.S. Department of Justice

KAREN E. KELLY
Chief, delegated Deputy Assistant
Attorney General for Criminal Matters
Tax Division
U.S. Department of Justice

_____
Kimberly M. Shartar
Assistant United States Attorney

_____
Mark F. Daly
Nanette L. Davis
Senior Litigation Counsel
Marissa R. Brodney
Trial Attorney

After consulting with its attorneys and pursuant to the plea agreement entered into this day between the defendant, CREDIT SUISSE SERVICES AG, and the United States, I, the designated corporate representative authorized by the Board of Directors, hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: *May 5, 2025*

*Jaclyn Barnao*
Jaclyn Barnao
UBS Head of Americas Litigation
Authorized Signatory for
Credit Suisse Services AG

We are CREDIT SUISSE SERVICES AG's attorneys.    We have carefully reviewed the above Statement of Facts with the Board of Directors.    To our knowledge, the Board of Directors' decision to stipulate to these facts is an informed and voluntary one.

Date: *May 5, 2025*

Mark Filip
Nicolas Thompson
Eric Stupp
Joel Fischer
Counsel for the Defendant